IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


UNITED STATES OF AMERICA,          .
                                   . Docket No. 4:18-MJ-00312-BD-1
PLAINTIFF,                         .
                                   . Little Rock, Arkansas
VS.                                . October 29, 2018
                                   . 10:31 A.M.
VALEN RAY GILMER,                  .
                                   .
DEFENDANT.                         .
 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .


                      TRANSCRIPT OF

                   DETENTION HEARING

           BEFORE THE HONORABLE BETH DEERE

           UNITED STATES MAGISTRATE JUDGE




ELECTRONIC COURT RECORDER-OPERATOR:   Ms. Suzy Flippen


Transcription Service:            Robin Warbritton
                                  Post Office Box 262
                                  Vilonia, AR   72173




PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

APPEARANCES:

For the Government:     Ms. Stacy Williams
                       U.S. Attorney's Office
                       Eastern District of Arkansas
                       Post Office Box 1229
                       Little Rock, AR   72203-1229

For the Defendant:     Ms. Latrece E. Gray
                       Federal Public Defenders Office
                       The Victory Building
                       1401 West Capitol Avenue
                       Suite 490
                       Little Rock, AR   72201

3

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S WITNESS: | | | | |
| Michael Gibbons | 7 | 16 | | |
| | | | | |
| DEFENDANT'S WITNESS: | | | | |
| Beula Gilmer | 24 | 29 | | |
| | | | | |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| Government's Exhibit No. 1 | 9 | 9 |

4

P R O C E E D I N G S

(Call to order of the Court.)

THE COURT:  Good morning.

MS. GRAY:  Good morning.

MS. WILLIAMS:  Good morning, Your Honor.

THE COURT:  Today is October 29th, 2018.  We're here for an initial appearance in *United States v. Valen Gilmer*.

Mr. Gilmer, I was presented with an affidavit signed by Detective Gibbons, who is sitting at counsel table with Ms. Williams.  After I reviewed this, I determined there was probable cause to believe that you had committed the federal crime of being a felon in possession of a firearm, so I signed the complaint.

You have certain Constitutional rights.  One is to remain silent.  If you speak today, anything you say, the Government will use against you.  You also have a right to be represented by a lawyer.  You've completed a financial affidavit that indicates you are self employed and earn 6,500 dollars a month.  I don't know that that qualifies you.  You are single, you live with your grandmother, or your expenses are such that I'm not sure that I can conclude that you're entitled to appointed counsel.

Ms. Gray?

MS. GRAY:  Your Honor, Mr. Gilmer indicates that he intends to hire counsel, so if the Court would provisionally

just appoint me for today.

THE COURT:  Yes.  You are entitled -- again, I'll repeat, you're entitled to counsel at every hearing in this case.  And even though you don't appear to be entitled to appointed counsel for the whole case, I do find that in order to proceed with this hearing, you're also -- you're entitled to an immediate initial appearance hearing, I am going to appoint Latrece Gray to represent you here today.

So, have you gone over the affidavit with your client?

MS. GRAY:  Yes, Your Honor.  We waive the issue of identity and waive the issue of probable cause.

THE COURT:  All right then.

I have received -- and let me say Ms. Williams is here from the U.S. Attorneys Office with Detective Gibbons.  Are you seeking detention?

MS. WILLIAMS:  We are, Your Honor.  But Ms. Bryant would like to have -- she wants to do the detention hearing, so she's asking for the three days.

THE COURT:  Well, the three days is not automatic.  You've got Detective Gibbons here.  He's got a pretty scant criminal history.

Are you prepared to go forward, or would you like time?

MS. GRAY:  No, we're prepared, Your Honor.

6

THE COURT: I mean, if you didn't have your agent here --

MS. WILLIAMS: Can we have 15 minutes, Your Honor?

THE COURT: You may certainly have 15 minutes. I -- I just don't like to -- this looks like a -- a case that we would normally set conditions on. And in cases like that, it's really not fair to make him sit in jail for three days.

MS. WILLIAMS: Yes, Your Honor.

THE COURT: Especially when you've got your detective here.

All right. We'll take a break then for 15 minutes.

(Recess.)

AFTER RECESS

THE COURT: Ms. Williams?

MS. WILLIAMS: Yes, Your Honor, we are ready now. And the United States would like to proceed on danger to the community, and risk of flight only because the Pretrial Services Report acknowledges fleeing and a failure to appear. And I would like to move to make that a part of the record.

THE COURT: I don't make Pretrial Services Reports a part of the record because they're not drafted for that purpose, but I have read it, and you may argue from it and question from it.

MS. WILLIAMS: Okay. Thank you, Your Honor. And the United States calls Mike Gibbons.

Gibbons - Direct                                                7

THE COURT:  All right.  Detective, if you would come forward.  Raise your right hand.  Do you swear the testimony you're about to give will be the truth, nothing but the truth, so help you God?

MR. GIBBONS:  I do.

MICHAEL GIBBONS, GOVERNMENT'S WITNESS, SWORN.

DIRECT EXAMINATION

BY MS. WILLIAMS:

Q    Please introduce yourself to the Court.

A    My name is Michael Gibbons.

Q    What do you do?

A    I'm a homicide detective with the North Little Rock Police Department and I'm also assigned as a Task Force Officer with ATF out of Little Rock.

Q    What is your main job as a homicide detective?

A    I investigate homicides that occur in the city of North Little Rock.  But, also, as a liaison officer, I -- I also investigate shootings or any violent -- violent offenses in the city, anything high profile.  I help focus on areas where lots of shots fired calls are reported, or shootings in general.  And as a liaison officer with ATF, I take those cases -- take those cases federal that -- that -- of individuals who pose a danger to society.

Q    Were you involved in the investigation of Valen Gilmer?

A    Yes, ma'am, I was.

Gibbons - Direct                                    8

Q   Let's talk about the instant arrest.  What happened at the instant arrest?

A   On October 23rd, 2018, around 5:46 in the afternoon, officers conducted a traffic stop on a black Chevy Malibu with paper tags.  The paper tags were expired.  The vehicle was known to be occupied and driven by Valen Gilmer.  And Mr. Gilmer was a suspect in several recent shootings in the city of North Little Rock at the time.  They conducted a traffic stop on the vehicle, made contact with -- with the occupants.  Mr. Gilmer was the front seat passenger.  They smelled marijuana inside the car.  One of the occupants in the car was a juvenile, admitted to smoking -- smoking marijuana, and indicated that's -- that's where the smell came from.

    Mr. Gilmer, at the time he was stopped, he was on active probation with the State of Arkansas for prior felony convictions and has a search waiver on file.  Because he was right beside -- next to his -- a block from his house -- a couple of blocks from his house when he was stopped, he was taken back to his house and a search was conducted of his residence.  During that search, officers located approximately 500 rounds of ammunition.  They searched his residence at 920 Greenlea.  Like I said, recovered approximately 500 rounds of ammunition and several different firearms.

    Let me get to that.  I'm sorry.

        MS. WILLIAMS:  Your Honor, may I approach?

Gibbons - Direct                                                    9

THE COURT:  Oh, you may.

BY MS. WILLIAMS:

Q    Could you describe what's in that picture?

A    This is just some of the firearms, ammunition, masks, and gun magazines that we recovered from Valen Gilmer's bedroom at 920 Greenlea.

Q    Is that an accurate depiction of the guns and stuff that you recovered?

A    It does.  It shows all the guns.  It's missing some -- this picture doesn't have all the magazines, the high caliber magazines that we recovered.  We recovered an additional -- I believe it was three -- at least three or four magazines that had the capacity of holding 30 rounds or more for assault rifles.

MS. WILLIAMS:  Your Honor, I move to admit Government's Exhibit 1.

THE COURT:  [Sneezes.]

MS. WILLIAMS:  Bless you.

THE COURT:  Excuse me.

MS. GRAY:  No objection, Your Honor.

THE COURT:  All right.  Did you call it Exhibit 1?

MS. WILLIAMS:  Exhibit 1.  Yes, Your Honor.

THE COURT:  Okay.  That's received.

(Government's Exhibit No. 1 identified and received.)

MS. WILLIAMS:  The only one we have.

Gibbons - Direct                                    10

BY MS. WILLIAMS:

Q    Go ahead.

A    In his bedroom, we also recovered a birth certificate for Valen Gilmer, an Arkansas identification card for Valen Gilmer, his Social Security card, a letter that was mailed to Valen Gilmer at 920 Greenlea, along with a Zastava, Z-A-S-T-A-V-A, 7.62 x 39 rifle, a Kel-THE COURT: 12-gauge pump shotgun, a Llama .380 caliber pistol, and a Walther .22 caliber UZI, along with a drum magazine that holds over a hundred rounds of ammunition, and so forth.

On the second search of the residence, we also located a -- several other magazines for guns, magazines for a Glock 40 -- or a Glock pistol.  We also recovered a gun box for a Glock .40 caliber pistol.  That box contained the original purchase receipts for that gun, and it showed it had been purchased by Valen Gilmer's grandmother, who also resides at the residence; however, the firearm was not in there.  But it also had, like I said, it had the receipts for the firearm, and it also had what's called a test fire.  Whenever you purchase a gun from the manufacturer, the manufacturer test fires the gun, and then when you buy the gun, it comes with those actual spent casings, those spent test fires.  And those were recovered as well.

Q    Did you speak to Mr. Gilmer's grandmother about the -- where the firearm was?

Gibbons - Direct                                          11

A    I did.  I interviewed her.  Her name is Beula, B-E-U-L-A,
Gilmer.  Ms. Gilmer acknowledged living at the residence with
her grandson, that her grandson did stay there.  She stated
that she owned three firearms.  Those -- two of them, a
shotgun and a revolver, were inside her closet.  The third
firearm was a Glock .40 caliber pistol that she normally keeps
under her bed, but she had stated that Glock .40 caliber is
now missing, and she had noticed it about two days prior.  She
stated that she had asked Valen Gilmer about the firearm, he
denied stealing it, but she said she kind of really -- really
didn't believe him.

     Again, we found that -- we ended up finding that gun box
in his bedroom.

Q    Now, let's move back to October 14th.  Can you describe
how Mr. Gilmer was involved in an incident that happened on
October 14th?

A    I can.  From October the 14th to October 21st, we had a
rash of incidences involving where -- that are all currently
under investigation, that Mr. Gilmer is named a suspect in.
One of them began on October 14th of 2018 at 5:21 in the
afternoon.  Officers took a report at 605 Pollock in North
Little Rock regarding an aggravated assault.  The complainant
in that incident stated that three black males in a white car
with masks.  And then they described various masks.  One of
the masks they described fits -- it's similar to the

Gibbons - Direct                                                    12

description of one of the masks we recovered from Mr. Gilmer's room.  And he also stated the person wearing it had dreads, was heavyset, and they believed it to be Mr. Gilmer.  But the three black males in the car drove by 605 Pollock, were pointing guns outside the window at the house.  One of them being what they believed to be an AK-47.

Q    Let me stop you right there.  Have you done an interview with Mr. Gilmer?

A    I have.

Q    When you finish each incident, will you explain to the Court what he said about each of these incidents?

A    I will.  In regard to this particular incident, the gentleman that lives at this house is a member of a rival gang of Mr. Gilmer's.  They're both -- Mr. Gilmer is in a gang and his neighbor -- and the guy on Pollock is in a gang, and there's some kind of ongoing feud between these two guys for -- over disrespecting each other.  During the interview, Mr. Gilmer, he admitted to being one of the three occupants in that car that drove by the residence and that pointed guns at -- at the residence; however, Mr. Gilmer stated the gun that he was possessing that day was not real.

But, again, they described Mr. Gilmer with what appeared to be an AK-47, and an AK-47 style firearm was recovered from his residence.

Q    Okay.  Moving on to October 15th?

Gibbons - Direct                                              13

A    On October the 15th, 2018, at 6:52 p.m., officers responded to 905 Healy Street in North Little Rock in -- regarding a domestic assault.  They made contact with the victim who lives at the residence, she stated that her boyfriend, Keyshaun Johnson, along with a couple of other black males had been at the residence, they were there to pick up some dogs.  And Mr. Gilmer breeds dogs for a living.  That they'd gone by Keyshaun's house to pick up some dogs. Keyshaun and his girlfriend got into an altercation, he began to punch her and choke her out, punch her in the face several times.  They got into a white car and they left.  And that white car is the victim's vehicle and may be Mr. -- it may be Keyshaun's, as well.  I'm not sure about that part.  But they left in that white car.  She went next door to seek assistance from the next door neighbor, who happens to be related to a Little Rock police officer.  So the police come for that.  The police take the report, they leave.  The officers get called back to the house on Healy at 2118 hours regarding an altercation where the Little Rock officer had called. Apparently, three black males in a silver Cadillac returned back to the house on Pollock, they were getting out to go back inside, the Little Rock officer was out in the yard with his father, and they were talking, and obviously they were aware of what happened next door, they make a comment to the three black males, you know, "What are you doing over here?"  And

one of the black males stated, quote, "That's my bitch."  And then they start toward -- the three black males start walking towards the Little Rock officer.  At that point, due to the circumstances that happened earlier and what he felt he was fearful for his life and his father's, he pulled his service weapon out and kind of kept it in what we call a ready position, where it was kind of down towards the ground.  At that point -- at that point, one of the black males stated, "You don't have a gun, we'll go get real guns."  And they get in their car and they leave.

Then, at approximately 10:04 p.m., so less than an hour later, officers respond to 905 Roseclair, which is at the intersection where Mr. Gilmer lives, to a shots fired in area. When they respond -- when they arrived in the area, they didn't find anyone outside; however, they recovered 29 7.62 caliber shell casings out in the middle of the street.

During Mr. Gilmer's interview, he admitted to being one of the three black males that got into his grandmother's -- I believe he said it was his grandmother's Cadillac, got in the Cadillac and drove back to the house.  He says he doesn't get involved in his friends' and their girlfriends' arguments, he just -- but he was there.  He acknowledged the altercation with the Little Rock police officer.  Now, he does give a little bit different chain of events as far as what the Little Rock officer's actions was.  He stated the officer pointed the

Gibbons - Direct                                          15

gun to his head.  And he said he's not going to be disrespected like that.  And then they left.  But he denies -- he states he wasn't responsible for shooting any of those 7.62 rounds; however, when I told him that preliminary results would most likely show -- or that the results may show that those were his -- matched one of his guns in his house, he acknowledged that most likely would happen, that those casings would match his gun, but he wouldn't say if he shot it or who else shot it.

Q    Next is October 19th, I believe?

A    Correct.  On October the 19th, 2018, at 8:06 p.m., officers responded to 1801 Washington Street in regards to a shooting.  Someone had shot several rounds into a car and into the house at the residence.  They went into the front door, into the walls and into the interior walls and bedrooms of that house.  No one was struck.  However, we recovered 14 .40 caliber Glock style shell casings.  And the investigation thus far, it's an ongoing investigation, has named K-3 as a suspect, which is one of the three individuals that was with him on all these different instances, and stated they were driving a black Impala -- Impala-type four-door vehicle with paper tags.  And, of course, Mr. Gilliam [sic] -- I'm sorry -- Mr. Gilmer was stopped in a four-door black vehicle with paper tags.

On October 21st of 2018, at 11:06 a.m., officers responded

Gibbons - Direct/Cross                    16

to 1114 North G Street in Dixie, and to an individual who had been shot at least two times.  He was shot in the back.  That investigation has -- is continuing and has revealed that K-3 is one of the suspects in that incident, along with a black four-door vehicle -- vehicle.  And six .40 caliber shell casings were recovered from that scene as well.

On Friday, I did a preliminary examination of the .40 caliber shell casings recovered from Dixie, the .40 caliber shell casings recovered from Washington Street, and the test fires that were recovered from the Glock gun case in Mr. Gilmer's residence, and the preliminary results show that those three -- the shell casings were all fired from the same weapon.

Q   Anything else?

A   That's it for now.

MS. WILLIAMS:  No further questions, Your Honor.

THE COURT:  All right.  Detective, Ms. Gray may have some questions for you.

THE WITNESS:  Yes, ma'am.

CROSS EXAMINATION

BY MS. GRAY:

Q   Officer, let's start with the beginning of your testimony. Now, you don't make the determination as to whether a charge should be brought federally, do you?

A   If a charge should what?  I'm sorry?

Gibbons - Cross                                          17

Q    Should be brought to federal court?  That's not your decision, is it?

A    I don't make those decisions.  No, ma'am.

Q    Right.  So let's go to your arrest of Mr. Gilmer.  That would have been October 28th or 26th?

A    23rd.

Q    23rd.  Okay.  Now when he was stopped, he was a passenger in the front seat, correct?

A    Yes, ma'am.

Q    There were no guns found on his person; is that correct?

A    No, ma'am.

Q    There was no ammunition found on his person?

A    No, ma'am.

Q    No drugs found on his person?

A    No, ma'am.

Q    And no other contraband found on his person?

A    No, ma'am.

Q    Okay.  And if I'm understanding your testimony correctly, there was a -- you said there was a box that was found on his bed or in his bedroom, that it was empty, but the box, I believe, contained a receipt?

A    The -- the Glock -- yes, ma'am, a Glock -- a Glock handgun box was recovered from his -- inside his room.  Yes, ma'am.

Q    Inside his room.  Okay.  Let's go to Government's Exhibit 1.  Do you have that in front of you?

Gibbons - Cross                                    18

A    Yes, ma'am.

Q    First off, there's only one mask in the picture; is that correct?

A    Yes, ma'am.

Q    Okay.  And these items, of course they're laid out -- this picture was taken not at Mr. Gilmer's residence; is that correct?

A    No, ma'am, this is at the North Little Rock Detective Division.

Q    Right.  And so, each of these things that are depicted in the picture were, of course, placed so that a picture could be taken of them, correct?

A    Correct.  Yes, ma'am.

Q    Okay.  Were you present when the search of that bedroom, that you all are saying belongs to Mr. Gilmer, was conducted?

A    Not the initial search.  No, ma'am.

Q    Okay.  So you said not the initial search.  Was there was a search that happened after that?

A    There was.  We did a -- I took a team back, we did a second search the next day.

Q    Okay.  And what was the results of that search?

A    That's where we recovered the Glock -- the Glock box, some more ammunition, a couple more magazines for a -- a assault style rifle, and I believe that was it.

Q    Okay.  So, the box that you're making reference to, it was

Gibbons - Cross                                    19

not initially on the bed; is that correct?

A    It was in -- it was -- no, when I -- when I found it, it was in a bag in his room.

Q    Okay.  In the closet?

A    No, I believe it was -- it was beside his -- by his bed. I mean, this room had lots of stuff in there.

Q    Okay.  So let's go to the October 15th, 2018 incident on -- is it Healy Street you've referred to?

A    Healy.  905 Healy.  Yes, ma'am.

Q    Okay.  Now, that whole incident where this woman says that her boyfriend punched her, there is no indication that Mr. Gilmer punched anybody --

A    No, ma'am.

Q    -- is that correct?

A    No, ma'am.

Q    And as your testimony has been, Mr. Gilmer breeds dogs; is that correct?

A    Correct.  Yes, ma'am.

Q    Okay.  And so, initially, did I understand you right, that they were there to actually pick up some dogs or drop off dogs?

A    That was my understanding, yes, ma'am --

Q    Okay.

A    -- to get some of the dogs.

Q    Now this 905 Roseclair incident, that was at 10:04 p.m.

Gibbons - Cross                                    20

Was that on the same day as the Pollock Street -- I don't think I've got that right -- the Healy Street incident?  I'm sorry.

A    Yes, ma'am.

Q    Okay.

A    It was -- the first incident on Healy happened at 6:52. The second incident happened at 9:18.  And then the shots fired was at 10:04.

Q    Now, you, of course, investigate homicides and shootings in North Little Rock, correct?

A    Yes, ma'am.

Q    Is it fair to say that shootings happen fairly often in North Little Rock?

A    Yes, ma'am.

Q    And they don't all occur on one day, do they?

A    Oh, no.

Q    Right.  So, any ammunition that may be found at any given place, you have no way of determining how long that ammunition has been there, do you --

A    No, ma'am.

Q    -- or the shell casings?

A    No, ma'am.

Q    Okay.  You -- was it you that interviewed Mr. Gilmer?

A    Yes, ma'am.

Q    Was that statement recorded?

Gibbons - Cross                                                      21

A    Yes, ma'am.

Q    How long did the interview last?

A    Let me see if I wrote the times down.  Because I just have my rough notes with me from the interview.  It started at 8:20 p.m.  And on my notes, I didn't -- I didn't put the discontinued time, so I don't -- I mean, I wouldn't -- I don't think it was more than a couple of hours.  I had already been up all night the night before, so I don't think this was very long.

Q    Was the interview videotaped?

A    Yes, ma'am.

Q    Okay.  So, it's video and audio?

A    Yes, ma'am.

Q    Now, during this entire investigation of Mr. Gilmer, at any point did he try to run away from the North Little Rock officers or from you?

A    Oh, no.

Q    Okay.  In fact, Mr. Gilmer's report was that a North Little Rock officer actually placed a gun to his head; is that correct?

A    A Little Rock -- he stated that the altercation with the Little Rock officer, not North Little Rock.

Q    Okay.

A    But, yeah, that he states that a Little Rock officer put the gun to his head and disrespected him.

Gibbons - Cross                                                    22

Q   No indication that Mr. Gilmer was combative or trying to fight with the -- any of the officers involved in the investigation?

A   No, ma'am.

Q   Okay.

        MS. GRAY:  That's all I have, Your Honor.

        THE COURT:  All right.  Were all the weapons found legal?  And I know it's not for a felon to possess, but?

        THE WITNESS:  I'm glad you asked that, because I did leave that out.  Mr. Gilmer admitted to purchasing all those firearms from various gun shows over time.  He stated he paid 400 dollars for the Draco, 325 for the UZI, 400 for --

        THE COURT:  An UZI is a legal weapon?

        THE WITNESS:  Yeah, kind of.

        THE COURT:  Generally speaking?  Okay.  That -- that was really out of curiosity.

        THE WITNESS:  When -- yeah, when you go to gun shows, you've got two different dealers -- two different types of people there; you have dealers who have license, who have FFL, who, if he was to go to them, he would have to do paperwork.  And then you have what they call the collectors, who are just collecting, and they don't require anything.  So, in his mind, he's -- and he stated, he goes, "I bought these legally, because I bought them and I didn't have to do paperwork."

        THE COURT:  Right.

Gibbons - Cross                                                  23

THE WITNESS:  And that -- that's his -- his mind-set.

THE COURT:  Okay.

MS. GRAY:  Just one follow up, Your Honor.

THE COURT:  All right.

FURTHER CROSS EXAMINATION

BY MS. GRAY:

Q   The gun that you were told belongs to his grandmother, have you determined that his grandmother is a licensed concealed carrier?

A   I don't know if she's -- she's -- I mean, she can legally carry a gun.  I don't -- I don't remember if she is concealed licensed.  She may be.  I don't remember.

Q   So, it's not illegal --

A   But she's legal.

Q   -- for her to have --

A   No, ma'am.

Q   -- a firearm?

A   No, ma'am.  No.

MS. GRAY:  Nothing further, Your Honor.

THE COURT:  All right.  Any closing remarks?

MS. GRAY:  Your Honor, I still have one witness.

THE COURT:  Oh, I'm sorry.

MS. GRAY:  That's okay.

THE WITNESS:  May I step down?

THE COURT:  You may stand down, Detective.

B. Gilmer - Direct                    24

THE WITNESS:  Thank you, Your Honor.

(Witness steps down.)

THE COURT:  Ms. Gray, I didn't mean to --

MS. WILLIAMS:  That's my only witness, Your Honor.

MS. GRAY:  Okay.  Your Honor, we call Beula Gilmer.

THE COURT:  All right.  Ms. Gilmer, would you come forward and raise your right hand?  Do you swear the testimony you are about to give will be the truth, and nothing but the truth, so help you God?

MS. GILMER:  Yes, ma'am.

BEULA GILMER, DEFENDANT'S WITNESS, SWORN.

THE COURT:  All right.  Have a seat.

MS. GRAY:  Your Honor, the purpose of Ms. Gilmer's testimony is just to offer the Court a release plan --

THE COURT:  Okay.

MS. GRAY:  -- with regard to Mr. Gilmer.

DIRECT EXAMINATION

BY MS. GRAY:

Q   Ms. -- excuse me -- Ms. Gilmer, would you spell your first name?

A   My first name is B-E-U-L-A, Beula.

Q   Beula.

A   Second name is -- I mean, my last name, G-I-L-M-E-R, Gilmer.  Beula Gilmer.

Q   Okay.  You are Valen -- is it Valen or Vaylen?

B. Gilmer - Direct                    25

A    It's Valen.

Q    Gilmer?

A    Yes, ma'am.

Q    You are his grandmother?

A    I am.

Q    And in what way are you related to him?

A    I'm his grandmother.

Q    Right.

A    By -- it's my daughter --

Q    Okay.

A    -- that's her son.

Q    Okay.  And you live in North Little Rock?

A    Yes, ma'am.

Q    How long does -- we're proposing your address for Valen to be released to.  Okay.  Are you okay with Valen living with you?

A    Yes.

Q    Okay.  Do you own a firearm?

A    Yes, I do.

Q    How many do you own?

A    I have three.

Q    Part of the conditions that the Court may impose is that you may have to take -- get rid of the guns out of your home if Valen --

A    That'll be --

B. Gilmer - Direct                         26

Q    -- is --

A    That'll be fine.  I can do that.

Q    You can get rid of the guns?

A    Yes, ma'am.

Q    Okay.  And --

A    And I do -- excuse me, I am a licensed, I have my license.
I am a licensed carrier.

Q    Okay.  Do you work?

A    Yes, I do.

Q    Where do you work?

A    I work at UALR catering, cafeteria.

Q    Okay.  What do you do there?

A    I work with catering.  We do sandwiches and just for
people like cater a dinner or business meeting, and they might
request like they want 50 sandwiches or pasta, and we prepare
-- we prepare that and somebody pick it up and take it to they
meetings and events that they have on campus.

Q    Okay.  Who else lives in your home?

A    Just me.

Q    Okay.

A    My daughter, I think she's fixing to move back, because I
live alone and they scared for me, so.

Q    Okay.  So, she's going to come --

A    Yeah.

Q    -- she's going to come back and live with you?

A    Yes.

Q    I'm not proposing you as a third party custodian, but if the Court requires that someone be responsible for Mr. Gilmer, are you willing to be responsible for him just in terms of if he violates the Court's rules, you would have to turn him in to the Court?

A    Yes.

Q    You'd be willing to do that?

A    Yes.

Q    Okay.  Now, what is -- how does Mr. Gilmer, Valen Gilmer, earn his money; does he have a job?

A    He -- well, he do, well, yeah, lawn work, and sometimes he has the boys to come over to my house because he don't want to pay them, and then he got his little two dogs, that are Blade and Pearl, and two puppies.  So, we --

Q    So, does --

A    -- he like dogs.

Q    Does he breed those dogs?

A    Yeah.

Q    Okay.  What kind of dogs are Blade and Pearl?

A    Cane Corsos.

Q    Corsos?

A    Yes.

Q    Okay.  So, Blade and Pearl are the parents, and then there's two puppies?

B. Gilmer - Direct                                      28

A    Yes.

Q    And does Valen Gilmer, does he sell those puppies?

A    Well, he trying to.

Q    Okay.

A    He ain't sold them yet.

Q    And if he remains locked up, who is going to take care of the dogs?

A    Well, I guess I would have to, but I'm scared of Blade. Blade is vicious.  But Pearl and the puppies, I love Pearl.

Q    Okay.

A    We cannot keep her chained for nothing.  She will get out of everything.

Q    Okay.

A    But I'm feeding them.  But, Blade, he is chained though for protection of the neighborhood, because if he get loose, he's kind of violent.

Q    Okay.

A    Yeah.

Q    Now, does Valen Gilmer help you at all around the house?

A    Yes, he better.  Yes, ma'am.

Q    Okay.  And what does he do?

A    With his dogs, he cuts the backyard, because ain't nobody going to go back there and cut the yard with Blade and them back there.  So, he cuts the backyard.  And he -- he need to clean up his room, but he -- you know how that goes, but,

B. Gilmer - Direct                                    29

yeah, he helps.

Q   Okay.  That's all -- oh, and I'm sorry, I didn't ask about the family situation.  Does Valen Gilmer, what other relatives does he have in the Central Arkansas area?

A   Well, my sisters, he's got four cousins.

Q   Okay.

A   My daughter has got four children.

Q   Okay.

A   And that's all, and my sister.  They live in Little Rock.  But he's the only child.

Q   And how many -- how long has he lived in Arkansas?

A   Who?

Q   Valen Gilmer?

A   Oh, he was born here in Arkansas.

Q   So, he's been here --

A   In Little Rock, as a matter of fact.

Q   He was born here; he's lived here all his life?

A   Yes.

Q   Okay.

       MS. GRAY:  Nothing further, Your Honor.

       THE COURT:  All right.  Thank you.

       THE WITNESS:  Does she --

       MS. WILLIAMS:  Can I have a brief cross?  Just briefly.

                        CROSS EXAMINATION

B. Gilmer - Cross                                    30

BY MS. WILLIAMS:

Q    Ms. Gilmer, was your grandson released to you on probation from the state court, was he living with you, with his probation officer?

A    Yes.

Q    You knew he was a felon, didn't you?

A    No, I did not.

Q    Oh, you didn't know?

A    What's a -- I mean, what you mean a felon?

Q    He had been convicted of a felony before, and that's why he was released to you on probation, on state probation; did you know that?

A    Well, I knew he -- he was released, but I didn't know nothing about no felony.  I don't know the law like that.  I just --

Q    Oh.

A    -- I mean, you know.

Q    Okay.  I understand.  Was he living with you all the time?

A    Most of the time, but he had a girlfriend.  Things that he could do at his girlfriend's house, he couldn't do at my house, because, you know, but, no, he in and out, in and out, but that's his residence.

Q    But you didn't report him to his probation officer for not living at your house, did you?

A    No, well, he did live there.  He was there every day.  He

B. Gilmer - Cross                                    31

didn't spend the night every night, but he was there.

Q    Yes, ma'am.   Thank you.

        MS. WILLIAMS:  No further questions, Your Honor.

        THE WITNESS:  All right.

        MS. GRAY:  No follow up, Your Honor.  And that's our only witness.

        THE COURT:  All right.  Ms. Gilmer, you may stand down.  Thank you for being here today.

        THE WITNESS:  Thank you.

    (Witness steps down.)

        THE COURT:  All right.  I think I've got this.  Is there anything anybody wants to say at this point?

        MS. WILLIAMS:  May we have a little brief argument, Your Honor?  Just, I would like to reiterate that the United States believes that Mr. Gilmer is a danger to the community. For the last two weeks, he's been implicated in several shootings in North Little Rock.  And the United States believes it's for his best interest to be incarcerated until his sentencing -- until his trial.

        THE COURT:  All right.  Ms. Gray?

        MS. GRAY:  Your Honor, we maintain that Mr. Gilmer is not a threat or danger to the community, and nor is he a flight risk.  The only evidence that the Government has presented is evidence of the items that were allegedly found in Mr. Gilmer's residence.  Even that evidence, taken at its

best light, there is no illegality other than the fact he's a convicted felon, but there's no allegation that those firearms were stolen.  His grandmother, in fact, is also a licensed concealed carry -- concealed carrier of weapons.

The other incidents, it sounds like the Government just wants to kind of string along pieces of evidence to try to show that Mr. Gilmer is a threat or danger to the community, but, in the grand scheme of things, Mr. Gilmer has not been charged with any of those incidents.  They just say that they've heard or he's been implicated, but, again, no concrete evidence has been presented.

And we also maintain that there are sets of conditions and rules that this Court can impose to assure the safety of the community and to assure that he returns to court.  So, we maintain he's not a flight risk, and that there are conditions this Court can impose.

THE COURT:  All right.  Thank you, Ms. Gray.

I don't think that Mr. Gilmer is a flight risk. There's really not enough to support that.

But I also find that I don't know -- there's a lot of evidence that he has not only possessed -- it's not just possessing a single gun, it's a whole array of extremely powerful weapons.  And it's possible that he was just in the wrong place at the wrong time, but he's just been present at too many shootings, and has admitted shooting, according to

the evidence, has admitted shooting guns in the city limits -- or in North Little Rock.

And considering the nature of these weapons, the number of the weapons, the mask, I'm going to -- I just find by clear and convincing evidence that there are no conditions I could set that would reasonably assure the public safety. He has a lovely grandmother, but I -- I don't feel comfortable that there is anything that I can do other than to remand him. So I'm going to remand you to the custody of the Marshal pending resolution of your case.

We're adjourned.

(Adjournment at 11:26 a.m.)

ELECTRONIC SOUND RECORDING CERTIFICATION:

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/Robin Warbritton                    November 26, 2018
Signature of Approved Transcriber     Date


Robin Warbritton
Typed or Printed Name